## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

KAREN L. WARD, Individually, and as
Personal Representative of the Estate of
EVELYN M. CORNELSON,

   Plaintiff,

   v.

700 MARVEL ROAD OPERATIONS, LLC
d/b/a MILFORD CENTER,
a Delaware limited liability company,

   Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

C.A. NO.: 22-_____

TRIAL BY JURY OF 12 DEMANDED

## NOTICE OF REMOVAL

Please take notice that Defendant 700 Marvel Road Operations LLC d/b/a Milford Center

(the "Milford Center") hereby removes this case from the Delaware Superior Court to the United

State District Court for the District of Delaware pursuant to 28 U.S.C. § 1331, § 1441, § 1442,

§1446, the Public Readiness and Emergency Preparedness Act, 42 U. S.C. §§ 247d-6d, 247d-6e

(2005) (the "PREP Act"), and the Declaration for Public Readiness and Emergency Preparedness

Act Coverage for Medical Countermeasures Against COVID-19, 85 Fed. Reg. 15198-01 (March

17, 2020) (including all amendments thereto), and further states:

  1.  On or about April 7, 2020, Plaintiff Karen L. Ward, as Power of Attorney for Evelyn

M. Cornelson, filed a Complaint in the Delaware Superior Court in a matter styled *Plaintiff Karen L.*

*Ward, as Power of Attorney for Evelyn M. Cornelson v. Milford Center, L.L.C.,* Case Number

N20C-04-059 JRJ (the "State Court Action").

  2.  On or about June 18, 2020, Milford Center timely answered the Complaint.

  3.  On or around April 30, 2021, a stipulated order was entered, amending the caption to

reflect the death of Evelyn M. Cornelson.

4.      On or around June 28, 2021, a stipulated order was entered, amending the caption to substitute 700 Marvel Road Operations LLC d/b/a Milford Center, Delaware limited liability company, as the Defendant.

5.      On or around December 20, 2021, a stipulated order was entered, granting leave for Plaintiff to amend the complaint to add allegations relating to Ms. Cornelson's death, which purportedly relate to COVID-19.  (*See* Am. Compl., ¶¶ 9-26, *inter alia.*)

6.      On or around December 20, 2021, Plaintiff's Second Amended Complaint was filed and served.  On or around January 5, 2022, Milford Center answered the Second Amended Complaint.

7.      In accordance with 28 U.S.C. §1446(a), a true and correct copy of all of the process and pleadings filed in the action to date, along with a copy of the Civil Docket Sheet, are collectively attached to this notice as Exhibit A.

8.      Milford Center's removal is timely under 28 U.S.C. § 1446(b) as it is being filed within 30 days of service of the Second Amended Complaint upon Milford Center on December 20, 2021.

9.      As required by 28 U.S.C. §1446(d), concurrent with this filing, Milford Center is filing a true and correct copy of this Notice of Removal with the Delaware Superior Court.  A true and correct copy of the Certificate of Service for the Notice of Removal is attached hereto as Exhibit B.

10.      This Notice of Removal is being filed in the United States District Court for the District of Delaware –  the District Court of the United States within which the State Court Action is pending, as required by 28 U.S.C. §§1441(a) and 1446(a).  Per D. Del. LR 81.1, the caption is identical, insofar as the parties are concerned, to the State Court Action's caption.

11.     Accordingly, Milford Center has satisfied all procedural requirements governing removal pursuant to 28 U.S.C. §§ 1441 and 1446, the Federal Rules of Civil Procedure, and the Local Rules of this Court.

12.     By filing this Notice of Removal, Milford Center does not waive any defenses with respect to the State Court Action and those that may be available to it under state or federal law.

## I.     PLAINTIFFS' ALLEGATIONS AND CLAIMS IN THE COMPLAINT

13.     Plaintiff's Second Amended Complaint alleges that Evelyn M. Cornelson was exposed to and infected with COVID-19 while residing at the Milford Center.  (*See* Am. Compl., ¶¶ 9-26, 44, 53, 57, *inter alia.*)

14.     Plaintiff's claims arise from Milford Center's response to the COVID-19 pandemic and their infection control measures and other countermeasures in an attempt to prevent or mitigate the spread of COVID-19.

15.     Plaintiff alleges that, in Defendant's management and operation of a COVID-19 countermeasure and facility, it failed to protect Ms. Cornelson from the COVID-19 virus during the pandemic by virtue of the manner in which it used, provided, administered, and utilized infection control and prevention procedures that were designated countermeasures to combat the COVID-19 outbreak. (*See* Am. Compl., ¶¶ 9-26, 44, 53, 57, *inter alia.*)

**II.**    **FEDERAL QUESTION JURISDICTION EXISTS UNDER 28 U.S.C. § 1331 BY
VIRTUE OF COMPLETE PREEMPTION UNDER THE PREP ACT**

16.    This case is removable under 28 U.S.C. § 1441(a) on the basis of "original

jurisdiction" because Plaintiff's Amended Complaint asserts claims "arising under" federal law

within the meaning of § 1331, as Plaintiff's allegations invoke the exclusive federal jurisdiction of

the Court and the immunities from suit and liability promised in the PREP Act. See 42 U. S.C. §

247d-6d(e) (exclusive federal cause of action and exclusive federal jurisdiction for claims arising

from the alleged administration and use of a COVID-19 countermeasure), (a)(1) and (b)(8)

(immunity from suit and liability under state and federal law, and preemption of state law)).

**A.**    **The PREP Act Provides for Complete Preemption**

17.    "When [a] federal statute completely preempts [a] state-law cause of action, a claim

which comes within the scope of that cause of action, even if pleaded in terms of state law, is in

reality based on federal law." *See Beneficial Nat. Bank v. Anderson*, 539 U.S. 1, 8 (2003).

*Beneficial* provides that state claims may be removed to federal court in two circumstances: (1)

when Congress expressly provides; or (2) when a federal statute wholly displaces the state-law

cause of action.    *Id.*   The PREP Act wholly displaces state-law causes of action for claims related

to a covered person's use, misuse, nonuse or allocation of countermeasures to combat a pandemic

by creating an exclusive federal remedy for those claims involving both an administrative and

judicial component. 42 U.S.C. §247d-6e; §247d-6d(d)(e). This remedial structure was

purposefully established by Congress and is explicitly "exclusive of any other civil action or

proceeding for any claim or suit [the PREP Act] encompasses ...." 42 U.S.C. §247d-6e(d).

Accordingly, Plaintiff's allegations of state law causes of action clearly bring her claims within the

purview of the PREP Act and mandate complete preemption. *See* Memorandum Rulings in *Rachal

v. Natchitoches Nursing & Rehab Center LLC,* Civil Docket No. 1:21-CV-00334 (W.D. La. April

30, 2021), at fn. 3, discussed *infra*; *see also* Order Regarding Plaintiffs' Motion to Remand and

Defendant's Motion to Dismiss the Complaint in *Garcia v. Welltower OpCo Group, LLC,* No.

8:20-cv-02250-JVS-KESx (C.D. Cal. Feb. 10, 2021), at p. 10, discussed *infra.*

### 1.    Prep Act Application to the COVID-19 Pandemic

18.    The PREP Act, which is a component of the Public Health Services Act ("PHSA"),

42 U.S.C. § 201, *et seq.,* grants healthcare providers and other covered persons immunity from

claims for injuries related to the use of approved countermeasures to combat a national public

health emergency, such as the COVID-19 pandemic. Congress's goal was to enable healthcare

providers, including nursing facilities, to focus on using every available means to combat a

pandemic and save lives without being chilled in their efforts by the threat of lawsuits.  42 U.S.C.

§ 247d-6d.

19.    The PREP Act is triggered when the Department of Health and Human Services

("HTIS") Secretary issues a declaration defining the scope and breadth of PREP Act protections

relevant to a particular public health emergency.  *See* 42 U.S.C. § 247d.  The PREP Act provides

that when a "disease or other health condition or other threat to health constitutes a public health

emergency," the Secretary of Health and Human Services (HHS) may issue a declaration

"recommending[] . . . the manufacture, testing, development, distribution, administration, or use of

one or more covered countermeasures" against the disease. *Id.* When such a declaration issues,

"covered persons" who administer or use "covered countermeasures" become "immune from suit

and liability under Federal and State law with respect to *all claims for loss caused by, arising out of*

*relating to, or resulting from* the administration to or the use by an individual of a covered

countermeasure" as defined by the Secretary of HRS. 42 U. S.C. § 247d-6d(a)(1) (emphasis added).

20.    A "covered person" includes a person or entity that "is a qualified person" or a

"program planner". 42 U.S.C. § 247d-6d(i)(2)(B).  A "qualified person" is defined as a "licensed

health professional or other individual who is authorized to prescribe, administer, or dispense such

countermeasures under the law of the State in which the countermeasure was prescribed, administered, or dispensed." 42 U.S.C. § 247d-6d(i)(2)(B)(iv).  A "program planner" is defined as "a State or local government, including . . . a person employed by the State or local government, or other person who supervised or administered a program with respect to the administration, dispensing, distribution, provision, or use of a security countermeasure or a qualified pandemic or epidemic product, including a person who has established requirements, provided policy guidance, or supplied technical or scientific advice or assistance or provides a facility to administer or use a covered countermeasure in accordance with a declaration under subsection (b)." 42 U. S.C. § 247d-6d(i)(6). Further, the PREP Act defines a "person" as "an individual, partnership, corporation, association, entity, or public or private corporation, including a federal, state or local government agency or department." 42 U.S.C. § 247d-6d(i)(5).

21.     Congress also explicitly wrote preemption into the PREP Act, stating that "no State or political subdivision of a State may establish, enforce, or continue in effect with respect to a covered countermeasure any provision of law or legal requirement that is different from, or is in conflict with, any requirement applicable under this section" and relates to, among other things, use or administration of the covered countermeasure. 42 U.S.C. § 247d-6d(b)(8)(A)-(B).

22.     In addition, Congress provides two exclusive federal remedies in the PREP Act for individuals with claims for loss arising out of the use of covered countermeasures. First, the Act creates a "Covered Countermeasure Process Fund" for purposes of "providing timely, uniform, and adequate compensation to eligible individuals for covered injuries directly caused by the administration or use of a covered countermeasure." 42 U.S.C. § 247d-6e(a). Claimants can receive compensation from this fund by applying for benefits through the Countermeasures Injury Compensation Program. *See* 42 C.F.R. §§ 110.1-110.100. Second, an injured person may bring

"an exclusive Federal cause of action" under the PREP Act "against a covered person for death or serious physical injury proximately caused by willful misconduct." 42 U.S.C. § 247d-6d(d)(1).

23.     The PREP Act sets forth specific procedures that govern lawsuits asserting this cause of action. *Id.* at § 247d-6d(e). Pursuant to subsection (e)(1), titled "Exclusive Federal Jurisdiction," any action for willful misconduct must be filed in the U.S. District Court for the District of Columbia.  Such claims are also subject to heightened pleading requirements (*i.e.,* requirement that claims are to be plead with particularity) and verification of and submission of a physician declaration in support of the complaint; and are assigned to a three- judge panel which has jurisdiction to consider motions to dismiss and motions for summary judgment. 42 U.S.C. § 247d-6d(e)(1), (e)(3) (e)(4) and (e)(5). Moreover, pursuant to Section 247d-6d(e)(10),

> The United States Court of Appeals for the District of Columbia Circuit shall have jurisdiction of an interlocutory appeal by a covered person taken within 30 days of an order denying a motion to dismiss or motion for summary judgment based on an assertion for the immunity from suit conferred by subsection (a) or based on an assertion of the exclusion under subsection (c)(S).

24.     The PREP Act was triggered for COVID-19 when the MIS Secretary issued a declaration on March 17, 2020, announcing that, as of February 4, 2020, "[1]iability immunity as prescribed in the PREP Act. . . is in effect" for any "[a]ctivities authorized in accordance with the public health and medical response of the Authority Having Jurisdiction to prescribe, administer, deliver, distribute or dispense the Covered Countermeasures following a Declaration of an emergency" related to COVID-19. Declaration Under the Public Readiness and Emergency Preparedness Act for Medical Countermeasures Against COVID-19, 85 Fed. Reg. 15,198, 15,20102 (Mar. 17, 2020), amended by 85 Fed. Reg. 21,012 (Apr. 15, 2020) (the "Declaration").

25.     In that Declaration, the term "administration" is defined, extending beyond the physical distribution of COVID-19 countermeasures to the "management and operation of

countermeasure programs as well as the management and operation of locations for [the] purpose of distributing and dispensing countermeasures." *See* 85 Fed. Reg. 15202.

26.     The Declaration also broadly defines "covered countermeasure" as:

> Covered Countermeasures are any antiviral, any other drug, any biologic, any diagnostic, any other device, or any vaccine, used to treat, diagnose, cure, prevent, or mitigate COVID-19, or the transmission of SARS-CoV-2 or a virus mutating therefrom, or any device used in the administration of any such product, and all components and constituent materials of any such product. Covered Countermeasures must be "qualified pandemic or epidemic products," or "security countermeasures," or drugs, biological products, or devices authorized for investigational or emergency use, as those terms are defined in the PREP Act, the FD&C Act, and the Public Health Service Act.

85 Fed. Reg. 15198.

27.     The Declaration was subsequently amended to add respiratory protective devices to the list of covered countermeasures. *See* 85 Fed. Reg. 21012, 21013.[1]   On June 8, 2020, the Declaration was amended again to reflect HHS's initial intent to "identify the full range of qualified countermeasures" as permitted under the PREP Act. 85 Fed. Reg. 35100, 35101.

28.     HHS also issued an Advisory Opinion regarding the Declaration on April 17, 2020, recognizing the broad, preemptive nature of the Declaration. *See* Exhibit C. The Opinion states that "immunity covers claims for loss sounding in tort or contract" and "PREP Act immunity must be read in light of the PREP Act's broad, express-preemption provision." *Id.* at p. 2.

29.     On August 14 and August 31, 2020, two additional opinion letters were issued by HHS that: (a) unequivocally confirm that senior living communities, such as Milford Center, are

---

[1] The Secretary issued an Amended Declaration under the PREP Act, which was effective as of March 27, 2020. The Amendment added respiratory protective devices approved by NIOSH (National Institute for Occupational Safety and Health) as a covered countermeasure under the PREP Act. On June 4, 2020, the Secretary further amended the March 10, 2020 Declaration to clarify that covered countermeasures under the Declaration include qualified products that limit the harm COVID-19 might otherwise cause. This Amendment was effective as of February 4, 2020.   *See* 85 FR 21012.

"covered persons" that may be immunized under the PREP Act by virtue of their status as both "program planners" and "qualified persons"; and (b) verify that COVID testing in nursing homes are a covered countermeasure triggering the Act. *See* Exhibits D and E, respectively.

30. Additionally, on October 23, 2020, HHS issued "Advisory Opinion 20-04 on the Public Readiness and Emergency Preparedness Act and Secretary's Declaration Under the Act," confirming that "administration" under the PREP Act is much broader than the mere physical provision of a countermeasure to a recipient and encompasses activities related to the "management and operation" of COVID-19 countermeasure programs and those facilities that provide countermeasures to recipients. *See* Exhibit F. This Advisory Opinion flatly rejects as "wrong" a pre-pandemic New York trial court ruling in *Casabianca v. Mt. Sinai Medical Center,* 2014 WL 10413521 (New York Co. 12/12/14), that the PREP Act requires the "direct physical" administration of a COVID-19 countermeasure and that the Act is not applicable to claims involving an omission or failure to act.

31. Further, on December 3, 2020, the MIS Secretary issued the Fourth Amendment to the Declaration ("Amendment Four") (published at 85 Fed. Reg. 79190 (Dec. 9, 2020)), which, *inter alia:*

    a. Expressly adopts all COVID-19 Advisory Opinions into its initiating Declaration, giving those directives controlling authority over interpretations of the PREP Act; *Id.* at 79191, 79192, 79194-95;

    b. Declares that an omission to administer a covered countermeasure can fall within the PREP Act's protections; *Id.* at 79191, 79194, 79197; and

    c. Makes explicit that cases involving COVID-19 covered countermeasures are to be in the federal system provided by Congress and that this "federal jurisdiction" is essential to the uniform provision of a national response to the COVID-19 pandemic; *Id.* at 79194, 79196, 79197-98.

*See* Exhibit G.

32.     Amendment Four also addresses HHS's authority to define the application of the PREP Act by stating: "42 U.S.C. 247d-6d(b)(7) provides that `[n]o court of the United States, or of any State, shall have subject matter jurisdiction to review, whether by mandamus or otherwise, any action by the Secretary under this subsection.'" *See* Amendment Four, at 26 n.25. Where Congress has expressly delegated interpretative authority to an agency, that agency's interpretative proclamations are controlling on the federal courts. *Chevron, Inc. v. NRDC, Inc.,* 467 U.S. 837, 843-44(1984).

33.     On January 8, 2021, HHS published an Advisory Opinion of the Office of General Counsel addressing questions raised by the Fourth Amendment. *See* Advisory Opinion 21-01 on the Public Readiness and Emergency Preparedness Act Scope of Preemption Provision, Jan. 8, 2021 ("AO 21-01), attached hereto as Exhibit H. AO 21-01 confirms that the PREP Act is indeed invoked by allegations that include not only "use" or administration of countermeasures, but alleged failure to act or inaction, where the non-use was the result of conscious decision-making. *See Rachal, supra,* at p. 12 (concluding that "HHS 's interpretation of the PREP Act and its scope [as set forth in AO 21-01] is reasonable" and, moreover, warrants deference given: "(i) the PREP Act's broad grant of authority to the HHS Secretary; (ii) the Secretary's express incorporation of the OGC' s Advisory Opinions into the Declarations for purposes of construing the PREP Act; (iii) the complexity of the relevant statutory provisions; (iv) the technical nature of the subject matter; and (v) the need for uniformity in the judiciary's interpretation of the PREP Act across the United States.").

34.     AO 21-01 also states that "[t]he PREP Act is a 'Complete Preemption' Statute," because it establishes both a federal and administrative cause of action as the only viable claim and vests exclusive jurisdiction in federal court. *Id.* at 2.

### 2.   Congress Explicitly Provided for Complete Preemption Under *Beneficial*

35.     Congress intended to regulate national responses to pandemics. The PREP Act

expressly satisfies the *Beneficial* test of preemption in stating that "a covered person shall be

**immune from suit and liability** under Federal and State law with respect to all claims for loss

caused by, arising out of, relating to, or resulting from the administration to or the use by an

individual of a covered countermeasure if a declaration under subsection (b) has been issued with

respect to such countermeasure." §247d-6d(a)(1)(emphasis added); *see also* (b)(8) ("during...a

declaration...no State...may establish, enforce, or continue in effect any provision of law or legal

requirement that - is different from...any requirement applicable under this section"). The PREP

Act further provides that this immunity "applies to any claim for loss that has a causal

relationship with the administration to or use by an individual of a covered countermeasure . . . or

use of such countermeasure." § 247d-6d(a)(2)(B). HHS has instructed time and again that this

preemption is to be given the broadest possible application.[2]

36.     Significantly, the PREP Act also provides an extensive claims and litigation

process for COVID-19 claimants in accordance the directives of *Beneficial* by providing for

federal redress and displacing state-law liability. Specifically, the PREP Act establishes a pre-

litigation no-fault monetary fund for those injured by the use or administration of covered

countermeasures that must be exhausted prior to relief under the federal civil claims process

(§247d-6e(a),(d)(1)), requiring an exclusive federal remedy for all claims related to

countermeasures (§247d-6e(d)(5)), and providing a Federal cause of action as the single

exception to immunity (§247d-6d(d)(1)).

---

[2] HHS refers **eight times** to the broad applicability of preemption of state law claims. *See*
Advisory Opinion 21-01 (Jan. 8, 2021), at p. 1, Advisory Opinion 20-04 (Oct. 23, 2020), Advisory
Opinion 20-02 (May 19, 2020), at p. 4-5, Advisory Opinion 20-01 (Jan. 8, 2020), at p. 2, and six times to
the broad applicability of immunity from state law claims. See Advisory Opinion 20-04 (Oct. 23, 2020), at
p. 1-2, and Advisory Opinion 20-01 (Jan. 8, 2020), at p. 2, 4, 7.

### 3. The New Administration Reaffirms PREP Act Provides Complete Preemption

37.     Consistently, the new Administration in 2021 reaffirmed that the PREP Act provides for complete preemption of COVID-19 state law claims. On January 28, 2021, HHS amended the Declaration for the fifth time again asserting that HHS Advisory Opinions are incorporated into the original Declaration. *See* Fifth Amendment to the Declaration Under the Public Readiness and Emergency Preparedness Act for Medical Countermeasures Against COVID-19 and Republication of the Declaration, (Jan. 28, 2021), 86 Fed. Reg. 7872, 7874, attached hereto as Exhibit I (stating "[t]he plain language of the PREP Act makes clear that there is complete preemption of state law.").

38.     There have also been two additional amendments further confirming that the preemptive effect of the PREP Act, with the sixth on February 16, 2021 and the seventh on March 16, 2021.[3]

39.     In addition to these HHS authorities, the U.S. Department of Justice ("DOJ") filed a Statement of Interest ("SOI") of the United States in *Bolton v. Gallatin Center for Rehabilitation & Healing, LLC,* No. 3:30-cv-00683 (M.D. Tenn. Jan. 19, 2021) at Docket No. 35, which constitutes the official position of the United States' interest in the enforcement of the PREP Act, stating, *inter alia,* that the PREP Act "completely preempts claims relating to the administration or use of covered countermeasures with respect to a public health emergency." *See* Exhibit J, at 1, 7-8. Further, it states that the two key provisions of the PREP Act — the immunity provision for all Federal and state law claims, and the exclusive alternative remedy provision, established as the sole exception to immunity — operate together to demonstrate the PREP Act's completely preemptive nature. *Id.* at 7-8. The DOJ also noted that the PREP Act is crucial to the "whole-of-nation response" to public health emergencies (which depends on cooperation among

---

[3] *See* 86 Fed. Reg. 9516 (Feb. 16, 2021), and 86 Fed. Reg. 14462 (Mar. 16, 2021).

private-sector partners and state and local officials across the nation) and "sweeping" immunity

was granted to encourage such cooperation. *Id.* at 1-2.

40.     On February 10, 2021, the U.S. District Court for the Central District of California

specifically invoked AO 21-01 to deny a motion for remand in an action against a nursing home

which alleged failure to adequately use Personal Protective Equipment ("PPE") and COVID

countermeasures, holding that "because the OGC stated that the PREP Act is a complete

preemption statute ... an adequate basis for federal question jurisdiction exists." *See Garcia v.*

*Welltower OpCo Group LLC,* No. 8:20-cv-02250-JVS-KESx, 2021 U.S. Dist. LEXIS 25738, at

*24 (C.D. Cal. Feb. 10, 2021), attached hereto as Exhibit K. The Court further found that the

allegations of the complaint fell squarely within the scope of the PREP Act:

> Plaintiffs' injuries "aris[e] out of, relat[e] to, or result[] from the
> administration to or the use by an individual of a covered
> countermeasure." See 42 U.S.C. § 247d-6d(a)(1). For example, the
> FAC details infection control measures and procedures including
> symptom checking, staff monitoring and screening, and limiting
> visitation ....In other places, the FAC directly draws upon the use
> (and in some case, misuse) of PPE .... The FAC also details
> screening measures employed by [Defendants] related to certain
> professional services provided within the facility. These allegations
> of use and misuse of PPE and the infection control measures
> directly relate to covered countermeasures within the meaning of
> the PREP Act.

*Id.* at *21.

41.     The District Court for the Western District of Louisiana likewise agreed that the

PREP Act is a complete preemption statute, finding that the PREP Act confers federal jurisdiction

and completely preempts claims falling within its scope because it includes: a civil enforcement

provision that creates a cause of action that both replaces and protects the analogous area of state

law; a specific jurisdictional grant to the federal courts for enforcement of the right; and a clear

Congressional intent that claims brought under the federal law be exclusive. *See Rachal, supra,* attached hereto as Exhibit L, at fn. 3.

      **B.**    **Plaintiffs' Claims Fall Within the Purview of the PREP Act**

     42.    Here, based on the face of the Complaint, the totality of the allegations made therein and the logical impact of its most central allegations, the PREP Act is implicated by Plaintiff's claims against Removing Defendant Milford Center as a "covered person" engaged in "recommended activities" under the Act. 42 U.S.C.A. §247d-6d(a)(1).

     43.    Defendant is a "covered person" as contemplated by 42 U.S.C. § 247d-6d and as confirmed by the August 14, 2020 HHS Advisory Opinion in that it is both a "qualified person" and "program planner" under 42 U.S.C.A. § 247d-6d(i)(2)(B). Removing Defendant was acting as a "qualified person" because it is a healthcare provider authorized to administer and/or use FDA approved medical devices, such as face masks, to prevent or mitigate the spread of COVID-19. 42 U.S.C. § 247d-6d(i)(8). Defendant was also acting as a "program planner" that managed, supervised and administered the infection control and COVID-19 specific programs in the treatment of COVID-19 residents, under which covered countermeasures, including, but not limited to, the use of face masks and other personal protective equipment, visitation restrictions, infection control procedures, testing, and screening requirements, at the facility in an effort to prevent and mitigate the spread of COVID-19 to its residents during the pandemic. *See Rachal, supra,* at pp. 9-10 (finding nursing homes are "covered persons" under the PREP Act).

     44.    Plaintiff has alleged claims involving a "covered activity" relative to a "covered countermeasure." Specifically, Plaintiff faults Milford Center for the manner in which it used, administered, and allocated COVID-19 countermeasures as part of their infection control program and further allege that, as result of this decision making, Ms. Cornelson became infected with COVID-19 during her residency.   (*See* Am. Compl., generally, and at ¶¶ 9-26, 44, 53, 57, *inter*

*alia.*)  Plaintiffs assert the negligent operation and management of a COVID-19 countermeasure plan, coupled with the alleged negligent operation and management of a COVID-19 countermeasure facility to include infection control procedures. These allegations cause this action to fall squarely under the definition of use and "administration" thereby invoking the PREP Act.  (*See id.*, generally, and at ¶¶ 23, 24, 25, 44, 53 & 57, *inter alia*.)

45.     Additionally, while Defendant respectfully asserts that the PREP Act completely preempts all claims arising from or relating to the use of a covered countermeasure, Plaintiff's allegations are completely preempted by the PREP Act under the "willful misconduct" standard outlined by the Third Circuit in *Maglioli v. Alliance HC Holdings, LC*, Nos. 20-2833, 20-2834, 2021 WL 4890189 (3d Cir. Oct. 20, 2021).[4]  As noted in *Maglioli*, pursuant to 42 U.S.C.A. § 247d-6d(d)(1), the PREP Act provides "an exclusive Federal cause of action against a covered person for death or serious physical injury proximately caused by willful misconduct." According to the *Maglioli* court, the PREP Act "unambiguously" creates an exclusive cause of action for willful misconduct, thereby establishing original federal jurisdiction over such claims allowing removal jurisdiction under 28 U.S.C. §§ 1331 and 1442. *Maglioli* at *7 (citing 42 U.S.C. §§ 247d-6d, 247d-6e).

46.     Plaintiff's Second Amended Complaint unequivocally alleges willful and intentional misconduct in the care and treatment of Ms. Cornelson.  Plaintiff alleges "Willful and Wanton Misconduct":  "Defendant… recklessly, outrageously and with reckless indifference and/or disregard to the rights of the Plaintiff;"  (Am. Compl., ¶57) "(b) Defendant… failed to properly assess the nature and extent of the care required … while COVID-19 was a danger;" "(c)…failed to maintain proper infectious disease policies and procedures." (*Id.* at (b),(c).)

---

[4] There is now a pending Petition for Rehearing En Banc in the *Maglioli* case, which asserts that the Third Circuit was wrong to find only "partial complete preemption" by the PREP Act. *See Maglioli*, Case No. 2:20-cv-06605-KM-ESK, at ECF No. 80.

47.     Furthermore, looking at the Second Amended Complaint as a whole, Plaintiff's allegations meet the definition of "willful misconduct," even where Plaintiff does not specifically include the term "willful" in the pleading.

48.     The term "willful misconduct" means "an act or omission that is taken — (i) intentionally to achieve a wrongful purpose; (ii) **knowingly** without legal or factual justification; and (iii) in **disregard of a known or obvious risk** that is so great as to make it highly probable that the harm will outweigh the benefit." 42 U.S.C. § 247d-6d(c)(1)(A)(emphasis added). "The criterion stated in subparagraph (A) shall be construed as establishing a standard for liability that is more stringent than a standard of negligence in any form or recklessness." *Id.* § 247d-6d(c)(1)(B).

49.     Here, Plaintiff alleges:  "Despite knowledge of Federal, State, and local guidelines, Defendant failed to take appropriate measure, screening procedures, and/or instruct employees on how to limit and/or avoid the spread of COVID-19 in its facility;"  (Am. Compl., ¶44(i).)

50.     Plaintiff further alleges that Defendant "willingly disregarded the explicit guidance and recommendations of various authorities, including, but not limited to, the CDC, CMS, DHS, State, Federal, and other entities."  (Am. Compl., ¶55(a).)

51.     Plaintiff claims the intentional understaffing of the Facility caused the damages she seeks relief for in this case, which include those related to COVID-19.  (*See id.* at ¶ 57(e).)

52.     There is no question that the language of the allegations in the aforementioned paragraphs clearly fall within the definition of willful misconduct. Plaintiffs' claims for willful misconduct unquestionably bring them under the PREP Act and invoke Article III jurisdiction and 28 U.S.C. §1331, 1441. "Congress said the cause of action for willful misconduct is exclusive, so it is." *Maglioli*, at *9.

53.     Additionally, the Complaint seeks relief for punitive damages.  *See* Am. Compl*.,*

¶¶ 35, 38, 42, 44, 46, 51, 53, 55, 59.  Under Delaware law, punitive damages are awardable only for intentional actions.  "Mere inadvertence, mistake or errors of judgment which constitute mere negligence will not suffice. Id. It is not enough that a decision be wrong. It must result from a conscious indifference to the decision's foreseeable effect."  *Jardel Co. v. Hughes*, 523 A.2d 518, 529 (Del. 1987).

54.     Defendant, of course, denies Plaintiff's incorrect claims. Nevertheless, Plaintiff's clear allegations of willful misconduct are within the scope of the PREP Act and are completely preempted.

## III.    FEDERAL QUESTION JURISDICTION ALSO EXISTS PURSUANT TO THE GRABLE DOCTRINE

55.     Federal jurisdiction also exists where an action "arises under" federal law and raises a substantial federal issue, actually disputed and substantial. *See Grable & Sons Metal Prods. V.  Dame Eng'g & Mfg.,* 545 U.S. 308 (2005).

56.     HHS, by and through its Fourth Amended Declaration and AO 21-01, also confirms that the PREP Act confers a separate, independent grounds for federal question jurisdiction under the *Grable* doctrine. *See* AO 21-01 at pp. 4-5, discussing *Grable*, 545 U.S. at 312. The Advisory Opinion states that "ordaining the metes and bounds of PREP Act protection in the context of a national health emergency necessarily means that the case belongs in federal court." *Id.* at p. 5. HHS provides that "there are substantial federal legal and policy...interests within the meaning of [the *Grable* doctrine] in having a unified, whole-of-nation response to the COVID-19 pandemic among federal, state, local, and private-sector entities." Id. (quoting 85 Fed. Reg. at 79, 197).

57.     HHS further states that: "Congress delegated to [the Secretary] the authority to strike the appropriate Federal-state balance with respect to particular covered countermeasures through PREP Act declarations." HHS's interpretation of *Grable* is consistent with the Supreme

Court's long-standing rule "that in certain cases federal question jurisdiction will lie over state-law claims that implicate federal issues." *Grable*, 545 U.S. at 312. "The doctrine captures the commonsense notion that a federal court ought to be able to hear claims recognized under state law that nonetheless turn on substantial questions of federal law, and thus justify resort to the experience, solicitude, and hope of uniformity that a federal forum offers on federal issues." *Id.*

58.     The *Grable* court determined that there is no single test for determining whether an embedded federal issue exists, but that, in general, a two-step process determines whether a state law claim "arises under" federal law: (1) the state law claim must necessarily raise a stated federal issue that is actually disputed and substantial; and (2) federal courts must be able to entertain the state law claims "without disturbing a congressionally approved balance of state and federal judicial responsibilities." 545 U.S. at 314; *see also Merrell Dow Pharmaceuticals Inc. v. Thompson,* 478 US 804, 808 (1986).

59.     Here, both prongs are satisfied. First, Plaintiff brings claims relating to Defendant's alleged use or administration (or misuse, nonuse or non-administration) of covered countermeasures in connection with the care and treatment of Ms. Cornelson, which necessarily implicates disputed and substantial federal issues. *See* § 247d-6d.

60.     Second, as confirmed by AO 21-01 and the HHS Declaration (and its amendments), the PREP Act expresses a clear intention to supersede and preempt state control of the very issues raised by Plaintiffs, *i.e.*, issues concerning Defendant's conscious decisions as when to use or administer (or not) covered countermeasures, including various infection control measures.

61.     A substantial and disputed federal issue regarding the application of the PREP Act to Plaintiffs' claims therefore necessarily exists and must be resolved by this Court to ensure the uniform and appropriate application of the PREP Act. The federal legal and policy issues

described in the Fourth Amended Declaration and the HHS Advisory Opinions control and authorize this Court to retain this action under *Grable*.

## IV.   FEDERAL QUESTION JURISDICTION EXISTS PURSUANT TO THE FEDERAL OFFICER REMOVAL STATUTE (28 U.S.C. § 1442(a)(1))

62.     Removal is also proper under 28 U.S.C. § 1442(a)(1), which provides for removal when a defendant is sued for acts undertaken at the direction of a federal officer.

63.     "[T]he federal officer removal statute [Section 1442(a)] is to be 'broadly construed' in favor of a federal forum.'" *In re Commonwealth's Motion to Appoint Counsel Against or Directed to Def. Ass'n of Phila.*, 790 F.3d 457, 466 (3d Cir. 2015) (quoting *Sun Buick, Inc. v. Saab  Cars USA, Inc.*, 26 F.3d 1259, 1262 (3d Cir. 1994)).

64.     This case is removable pursuant to Section 1442(a) because: "(1) Defendant[s] [is a] `person[s]' within the meaning of the statute; (2) Plaintiff['s] claims are based upon Defendant's conduct 'acting under' the United States, its agencies, or its officers as part of the nation's critical infrastructure; (3) Plaintiff['s] claims are 'for, or relating to' an act under color of federal office; and (4) Defendant[s] raise[s] a colorable federal defense to the Plaintiff['s] claims." *Papp v. Fore-Kast Sales Co.* 842 F.3d 805, 811 (3d Cir. 2016). All requirements for removal under § 1442(a)(1) are satisfied here.

65.     Defendant is a "person" under the federal officer removal statute, as it is a limited liability company, and companies are "person[s]" pursuant to Section 1442(a)(1).  *See* 1 U.S.C. § 1.

### A.     Acting under the Direction of a Federal Officer

66.     Once COVID-19 began to spread, the federal government declared that healthcare providers were "critical infrastructure" businesses that were obligated to aid the federal

government in preventing the spread of the virus during this unprecedented national emergency by following the federal government's direction under its close supervision.[5]

67.    The Centers for Disease Control and Prevention (CDC) issued updated interim guidelines for implementing safety practices for **critical infrastructure workers** who may have had exposure to a person with suspected or confirmed COVID-19.

68.    Designating their activities as "critical infrastructure" enabled the federal government to enlist the aid of these private parties to ensure the continued operation of the healthcare infrastructure that is "so vital to the United States that [its] incapacity or destruction . . . would have a debilitating impact on security, national economic security, national public health or safety, or any combination of those matters." 42 U.S.C. § 5195c(e). And when the federal government instructed these private parties on how to carry on their "critical" business during this national emergency, it enlisted them to carry out duty of the government itself to ensure the continued provision of "services critical to maintaining the national defense, continuity of government, economic prosperity, and quality of life in the United States." Id.; 42 U.S.C. § 5195c(b)(3).

69.    During this time of crisis, there has been a nationwide PPE shortage.[6] FEMA worked closely with businesses designated as "healthcare/public health" critical infrastructure to

---

[5]  *See* Memorandum on Identification of Essential Critical Infrastructure Workers During COVID-19 Response, CISA.gov, *available at* https://www.cisa.gov/sites/default/files/publications/CISA-Guidance-on-Essential-Critical-Infrastructure-Workers-1-20-508c.pdf (last visited Apr. 28, 2021).

[6]  As is widely known, there has been a scarcity of available PPE and testing supplies on a global level during the pandemic, which has required health care providers to adjust and adapt on a daily basis in an effort to fight the COVID-19 virus. Brighton's COVID-specific programs by necessity included methodology of allocating these scarce countermeasures. During the time frame relevant to the complaint, CDC and CMS issued directives pertaining to the preservation of PPE and testing. See, e.g., CDC Health Advisory dated 1/8/2020, available at https://emergency.cdc.gov/han/han00424.asp; CDC Health Advisory dated 1/17/2020, available at https://emergency.cdc.gov/han/han00426.asp; CDC, Interim Infection Prevention and Control Recommendations for Patients with Known or Patients Under Investigation for 2019 Novel Coronavirus (2019-nCoV) in a Healthcare Setting, dated 1/24/2020, available at https: //web. archive. org/web/20200128222452/https : //www.cdc.gov/coronavirus/2019-

address the need for PPE and other critical supplies to continue operations in accordance with CDC guidance. Congress also expressly approved and supported the pervasive new role of the federal government in overseeing the operation of "critical infrastructure" skilled nursing homes and assisted living communities by allocating additional funding to such healthcare providers under the CARES Act to accommodate critical ongoing operations in view of the pandemic.

70.     Also, at the very beginning of the COVID-19 crisis in the United States, the federal government enlisted nursing facilities and assisted living communities in its efforts to fulfill the government's task of ensuring that these facilities could assist in the safe transfer and admission of patients between healthcare facilities during an unprecedented national crisis. In March 2020, it was reported that U.S. hospital beds were already maxed out (prior to COVID-19 hitting the hospitals) limiting healthcare facilities' ability to handle the "presumed" influx of COVID-19 patients.[7]

71.     Therefore, prior to the COVID-19 pandemic, regulation of skilled nursing and assisted living facilities was very general in nature. However, as a direct result of the COVID-19 global public health crisis and their designation as critical infrastructure, there was a clear and

---

ncov/hcp/infection-control.html (archived website); CDC Health Advisory dated Feb 28, 2020, available at https://emergency.cdc.gov/han/2020/han00428.asp; CDC Health Advisory dated March 8, 2020, available at https://emergency.cdc.gov/han/2020/han00429.asp; CDC, "Interim Infection Prevention and Control Recommendations for Patients with Suspected or Confirmed Coronavirus Disease 2019 (COVID-19) in Healthcare Settings," dated 3/31/2020, available at https: //web. archive. org/web/20200331043207/https : //www. cdc. gov/coronavirus/2019-ncov/infection-control/control-recommendations.html?CDC AA refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2 F2019-ncov%2Fhcp%2Finfection-control.html (archived website); CMS, "Guidance for use of Certain Industrial Respirators by Health Care Personnel," dated 3/10/2020, available at https://www.cms.gov/files/document/qso-20-17-all.pdf; CDC, "Strategies for Optimizing the Supply of Facemasks," dated 3/18/2020, available at http://web.archive.org/web/20200318213323/https ://www.cdc.gov/coronavirus/2019-ncov/hcp/ppe-strategy/face-masks.html (archived website).

[7]  *U.S. Hospital Beds Were Already Maxed Out Before Coronavirus Pandemic,* U.S. News (Mar. 26, 2020) *available at* https://www.usnews.cominews/health-news/articles/2020-03-26/us-hospital-beds-were-already-maxed-out-before-coronavirus-pandemic (last visited Apr. 28, 2021).

sudden paradigm shift. Thus, since the pandemic began, through the federal directives issued by the CDC, CMS and others, federal authorities have been explicitly guiding operational decisions related to clinical pandemic response in skilled nursing facilities. As just a few examples, facilities were ordered to restrict visitation, cancel communal dining, and implement active screening and staff for fever and respiratory symptoms.[8]

72.      Facilities were also instructed on, among other things, which patients and staff to test for COVID-19, under what circumstances to use and how to conserve PPE, when to permit staff who had COVID-19 to return to work, how to mitigate staff shortages including when to permit COVID-19 positive but asymptomatic staff to return to work, and how to handle the isolation of residents infected with COVID-19 and those under investigation for COVID-19. These very detailed clinical directives and instructions represented a marked departure from the regulatory structure which existed before the pandemic.

73.      The United States Supreme Court has held that the phrase "acting under" involves "an effort to assist, or help carry out, the duties or tasks of the federal superior." *Watson v. Philip Morris Cos.,* 551 U.S. 142, 152 (2007); *see also In re Commonwealth's Motion to Appoint Counsel Against or Directed to Def. Ass'n of Phila, supra,* at 457. The "acting under" requirement is broad and is also to be liberally construed. *Watson* at 147. Federal courts "have explicitly rejected the notion that a defendant could only be 'acting under' a federal officer if the complained-of conduct was done at the specific behest of the federal officer or agency." *Papp v. Fore-Kast Sales Co.,* 842 F.3d 805, 813 (3rd Cir. 2016). And detailed regulation to compel

---

[8]   *E.g.,* Ctrs. For Medicare & Medicaid Servs., *COVID-19 Long-Term Care Facility Guidance* (Apr. 2, 2020); Ctrs. For Disease Control & Prevention, *Strategies for Optimizing the Supply of Facemasks* (updated Mar. 17, 2020); CDC, *Using Personal Protective Equipment (updated Aug 19, 2020); Exec. Order No. 20-009, In Re: Suspension of Statutes, Rules, and Orders Pursuant to Executive Order Number 20-52, Made Necessary by the COVID-19 Public Health Emergency; Exec. Order No, 20-52, Emergency Management-COVID-19 Public Health Emergency.*

specific conduct satisfies the second requirement. *Winters v. Diamond Shamrock Chem. Co.,* 149

F.3d. 387 (5th Cir. 1998).

74.     "[R]emoval by a 'person acting under' a federal officer must be predicated upon a

showing that the acts that form the basis for the state civil or criminal suit were performed pursuant

to an officer's direct orders or to comprehensive and detailed regulations." *Cf. Bakalis v. Crossland*

*Savings Bank*, 781 F. Supp. 140, 144-145 (E.D.N.Y. 1991); *Ryan v. Dow Chemical Co.*, 781 F.

Supp. 934, 947 (E.D.N.Y. 1992); *Fung v. Abex, Corp.*, 816 F. Supp. 569, 572 (N.D. Cal. 1992).

The "acting under" requirement is met when a defendant is acting pursuant to detailed and

ongoing instructions from a federal officer. *Winters, supra*, 149 F.3d. 387 (5th Cir. 1998).

75.     Defendant satisfies the first element for federal officer removal because, as part of

the country's critical infrastructure, Defendant acted at all relevant times "to assist, or to help

carry out, the duties or tasks of the federal superior," by aiding the federal government in

"fulfill[ing] other basic governmental tasks" that otherwise "the Government itself would have

had to perform." *See Watson,* 551 U.S. at 153-54.[9]

76.     The decision in *Fields v. Brown,* No. 6:20-cv-00475, 2021 WL 510620 (E.D. Tex.

Feb. 11, 2021) is persuasive. In pertinent part, the court in *Fields* held that a Tyson Foods

meatpacking facility was "acting under" the direction of a federal officer because Tyson Foods

"exhibited 'an effort to help assist, or carry out, the duties and tasks" of the federal government by

"working directly with the Department of Agriculture and the [Food Safety and Inspection

Service] to guarantee that there was an adequate food supply" during the COVID-19 pandemic.

*Id.* at *3 (citation omitted). In holding that federal officer removal was appropriate, and that the

---

[9] *Maglioli, supra,* which is not yet final and hence not binding, misapplied the *Watson* test
for federal officer jurisdiction largely out of a fear of creating a "slippery slope." *Maglioli, supra,* at *5. The Court
worried that "clergy, farmers, bus drivers" may be deemed federal officers if it recognized nursing facilities as
federal officers. *Id.* However, such institutions do not have Letters or Declarations from MIS declaring them to be
"program planners," "covered persons," "qualified persons," or "critical partners" in fighting COVID-19 under the
PREP Act like Defendant in this action.

Tyson Foods meatpacking plant did in fact "act[] under" the direction of a federal officer in continuing its meatpacking operations, the court rejected plaintiffs' argument that Tyson Foods merely "communicated with federal regulators and that Tyson Foods was subject to federal regulation." *Id.* Rather, the court relied on the additional facts plead by Tyson as outcome determinative: *inter alia, ". . .*the critical-infrastructure designation. . ." of Tyson Foods' meatpacking plant, the fact that the "Department of Agriculture and the [Food Safety Inspection Service] closely monitored Tyson Food's meatpacking plants, staffing some employees onsite," and that "Congress even allocated additional funding to [the Food Safety Inspection Service] to ensure that they had the resources to adequately supervise meatpacking plants like that one at issue. . ." *Id.*

77.     Similarly, Milford Center was designated as a "critical infrastructure," was closely monitored by the federal government and assisted the government and, as such, Milford Center was "acting under" the direction of a federal officer in responding to COVID-19 pandemic.

### B.     Causal Nexus Exists Between Plaintiff's Claim and the Actions Taken by Milford Center Pursuant to Federal Direction

78.     The next requirement, often referred to as the "nexus" or "causation" requirement, demands that the alleged conduct have been undertaken "for or relating to" a federal office. To meet this requirement, "it is sufficient for there to be a connection or association between the act in question and the federal office." *Defender Ass'n*, 790 F.3d at 471.

79.     There is a clear causal nexus between the claims against Milford Center and the actions taken by it in responding to and administering care related to the COVID-19 outbreak. Plaintiff's Second Amended Complaint specifically alleges a deficiency in Defendant's actions concerning use of infection control procedures taken in efforts to prevent the spread of COVID-19 within the nursing facilities while responding to constantly evolving governmental directives

and working to preserve resources so as to enable a nationwide response. Unquestionably, the nexus element is met as evidenced by the nature of the claims and the various orders, guidelines and recommendations followed by Defendant in responding to the pandemic.

80.     For example, on March 8, 2020, the CDC noted that with increased access to testing, the criteria for such testing was being expanded to include symptomatic individuals with chronic medical conditions, individuals over the age of 65, and individuals who were in close contact with a laboratory that had a confirmed positive COVID-19 patient. Updated Guidance on Evaluating and Testing Persons for Coronavirus Disease 2019 (COVID-19), CDC, available at https://emergency.cdc.gov/han/2020/HAN00429.asp. Defendant was following explicit guidance issued by the CDC with respect to the testing of its staff and residents, and, as such, was required to only test those individuals who met CDC criteria for doing so.

81.     On March 17, 2020, the CDC further directed facilities as to when and under what circumstances the use of a facemask or N95 respirator was appropriate, and it also ordered facilities to conserve all types PPE otherwise used in the ordinary course of business given known and ongoing shortages. Strategies for Optimizing the Supply of N95 Respirators, CDC, available at https: //www. cdc. gov/coronavirus/2019-ncov/hcp/respirators- strategy/index .html.

82.     Defendant was required to follow these directives. As part of the nation's "critical infrastructure," Milford Center was acting under the explicit direction of the federal government in implementing its on-site response to the COVID-19 pandemic.

###     C.     Defendant Has a Colorable Defense Based on Federal Law

83.     For purposes of removal, Defendant must present a colorable defense based on federal law: the defense must only be "colorable," and need not be "clearly sustainable," as the purpose for the removal statute is to assure that the validity of the defense is tried in federal court.

*Willingham v. Morgan,* 395 U.S. 402, 407 (1969). "[O]ne of the most important reasons for removal is to have the validity of the defense of official immunity tried in a federal court;" for this reason, the Supreme Court has "rejected a narrow, grudging" approach when analyzing whether a defendant had raised a colorable federal defense. *Jefferson Cty. v. Acker,* 527 U.S. 423, 431 (1999).

84.     Defendant asserts a federal defense in this case - namely, immunity under the PREP Act for their administration and use of "covered countermeasures." In doing so, Defendant satisfies the "colorable federal defense" element of the federal officer removal statute. A defendant need only show it has a plausible federal defense. *Ruppel v. CBS Corp.,* 701 F.3d 1176, 1182 (7th Cir. 2012). *See* Section II.B., *supra*.

85.     Here, Defendant is immunized under the PREP Act for the conduct about which Plaintiff complains, as Defendant acted in accordance with federal directives and guidelines aimed to protect residents and staff from COVID-19 exposure and prevent the spread of the virus.

**WHEREFORE**, this action is hereby removed to this Court from the Delaware Superior Court. Plaintiff is hereby notified to proceed no further in state court.

MARSHALL DENNEHEY WARNER
COLEMAN & GOGGIN

  */s/ Artemio C. Aranilla*
Bradley J. Goewert (I.D. 4402)
Thomas J. Marcoz, Jr. (I.D. 5557)
Artemio C. Aranilla (I.D. 4516)
1007 N. Orange Street, Suite 600
 P.O. Box 8888
Wilmington, DE 19899-8888
(302) 552-4354
Email: acaranilla@mdwcg.com

*Attorneys for Defendant 700 Marvel Road Operations LLC d/b/a Milford Center*

Dated: January 19, 2022
LEGAL/143674305.v1

26